Sandy GUBERNIK, Plaintiff,

v.

HAN–DEE PAK, a corporation,
Defendant.

Nos. 46789, 46811.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 7, 1984.

Motion For Rehearing and/or Transfer to
Supreme Court Denied March 29, 1984.

Application to Transfer Denied
May 15, 1984.

Burton H. Shostak, St. Louis, for plaintiff.

Mark T. Keaney, St. Louis, for defendant.

SMITH, Judge.

■ The trial court ordered an accounting by defendant on commissions due to plaintiff. Following a trial on the accounting the court entered judgment for plaintiff in the amount of $19,700.87. Defendant appeals from the action of the trial court in ordering an accounting; plaintiff appeals from the award made. Our review is that mandated by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) and we review the facts most favorably to the findings and judgment of the trial court.

In 1976, plaintiff was engaged in the business of manufacturing and selling packaged premoistened applicators bearing the trade name of TowelWets. This business was conducted through his solely owned corporation, Portion Control Corp. In mid-1976 plaintiff was in financial difficulty and in danger of losing the machinery used to produce TowelWets. He entered into negotiations with defendant, a manufacturer and seller of pre-packaged condiments such as those used by airlines and fast food restaurants. These negotiations resulted in a letter from defendant to plaintiff which is set out in full in the margin.[1]

1. "July 22, 1976
Mr. Sandy Gubernik
Portion Control Corp.
100 Weldon Parkway
St. Louis, Mo. 63043
Dear Sandy:

Below is a confirmation of our agreement talks; please sign in the space indicated at the bottom of the letter. We will be preparing some formal documents later on through our attorney in Atlanta.

1.) Han-Dee Pak will pick up the payments on machines # 424, # 366 and # 393 as per letters dated July 22, 1976 to Equilease, Fidelity Bank, and First National Bank. Han-Dee Pak will not be endorsing any of these notes and its only obligation will be to return the equipment if this agreement fails for any reason.

2.) Han-Dee Pak will have the option to purchase these three machines at the end of each current lease arrangement for 10% of the original purchase price of each machine.

3.) Machines will be insured by Han-Dee Pak with Sandy Gubernik and mortgage holders named as loss payees.

4.) Han-Dee Pak will pay current prices for usable supplies held by Portion Control.

5.) Han-Dee Pak to pay $300.00 for product scale and $150.00 for overhead hoist.

6.) All customers will be invoiced directly by Han-Dee Pak at a price dictated by Sandy Gubernik.

7.) Han-Dee Pak's price will be figured as per the attached price build up sheet (which will be updated monthly), less 5% commission off our Bottom Line as shown. All shipments are presumed to be F.O.B. Atlanta and should any

The letter was never signed by plaintiff, but the three machines referred to in paragraph 1 were picked up in St. Louis by defendant and moved to its plant in Atlanta. No "formal documents" were thereafter prepared. From the date of the letter until the end of 1977, defendant paid commissions to Gubernik as provided by the letter. In 1978 defendant ceased paying commissions to Gubernik. The machines were never returned to plaintiff nor was he paid anything for them. In 1981 defendant ceased manufacturing TowelWets because of unprofitability.

The trial court found that the July 22, 1976, letter constituted a contract between the parties and that plaintiff was entitled to an accounting thereunder. Defendant appeals from that determination contending that Gubernik never accepted the contract and that no meeting of the minds occurred between the parties.[2] We find no merit to these contentions.

It is important to note the nature of the transaction between the parties. Gubernik transferred to Han-Dee Pak his manufacturing equipment and the right to make and sell his product bearing his trade name. In return for that he was to receive commissions on all TowelWets sold. Those commissions were to be computed on two different bases. For customers which were not originally Gubernik's he would receive a straight 4% commission. For customers originally his or subsequently obtained by him, he was to receive the difference between the defendant's "bottom line" cost of goods and the price for which the product was sold. This "bottom line" figure included a 10% profit to defendant. Gubernik was authorized to establish the price to be charged to customers. Gubernik, however, undertook no obligation under the letter to engage in any sales activities. He had an incentive for so doing in the commissions he would receive for customers generated by him and the possibility of termination of the agreement if defendant did not feel Gubernik was generating sufficient business to justify the equipment. In the latter event Han-Dee Pak was to return the equipment. That never happened.

■ The parties operated in accordance with the letter agreement for a year and one-half. Gubernik transferred the machines to defendant which then began making the payments thereon, referred to in paragraph (1) of the letter. Han-Dee Pak purchased from plaintiff the items referred to in paragraphs (4) and (5). Customers of Gubernik's were invoiced directly by Han-Dee Pak and commissions as provided in paragraphs (7), (8) and (9) were paid until 1978 when Han-Dee Pak unilaterally ceased paying them. Han-Dee Pak, which undertook in the letter to prepare the "formal documents," never did so nor did it prepare the "exclusive loyalty and non-compete clause" provided for in paragraph (12). Gubernik testified he did not compete and loyally sought to have his customers place their business with Han-Dee Pak. While

---

freight be prepaid, it will be added to our Bottom Line price.

8.) Sandy Gubernik will be paid the difference between our price and the price billed to the customer, less freight but including 5% commission of our Bottom Line. This will effect only those sales which Sandy has currently been servicing or those he develops in the future. Sandy is to furnish a list of these customers and keep it updated.

9.) For those sales developed by Han-Dee Pac, [sic], Sandy is to be paid a 4% commission on our Bottom Line Sell Price.

10.) Han-Dee Pac [sic] has no obligation for any receivables or payables currently held by Portion Control.

11.) Han-Dee Pac [sic] has the sole right to terminate this agreement and return equipment should it feel that Sandy is not generating enough sales to justify the equipment.

12.) Sandy Gubernik will agree to an exclusive loyalty and non-compete clause to be arranged later.

   Yours truly,
      /s/ Darrel L. Shattuck
CC: H. Sodel
DLS/skp
AGREED TO BY _____  _____

          SANDY GUBERNIK        DATE"

**2.** No contention is raised challenging the status of Gubernik alone to bring this action. The parties have treated Gubernik as the alter ego of Portion Control Corp. and we shall do the same.

the letter asked Gubernik to sign, it did not request return of a signed copy nor state that signature was required to accept the terms of the letter. The letter is admittedly poorly drafted but Gubernik testified he agreed with the terms therein in principle while believing certain of the provisions should have been clarified or explained. He believed this would be done in the "formal documents" which Han-Dee Pak said it would prepare but did not. We find no error in the trial court's finding that the letter was accepted by Gubernik and constituted the agreement between the parties. See *Durasteel Co. v. Great Lakes Steel Corp.*, 205 F.2d 438 (8th Cir.1953) [7, 8]; *Hunt v. Dallmeyer*, 517 S.W.2d 720 (Mo. App.1974) [9, 10].

■ We must also reject defendant's contention that the agreement constituted an arrangement terminable at will and therefore subject to no commissions after Gubernik ceased generating business. The agreement contemplated that Gubernik would receive commissions on all sales of TowelWets so long as defendant continued in that business. This was true whether Gubernik performed additional services or not. Gubernik substantially performed the agreement when he transferred his machinery to Han-Dee Pak and allowed it to produce and sell TowelWets. Defendant could not thereafter terminate its obligations under the agreement except in accord with the terms of that agreement, which it did not do. The parties functioned under the agreement for approximately eighteen months and it was never terminated pursuant to its terms. We therefore find no error in the finding of the trial court that

Gubernik was entitled to an accounting under the contract. See *Durasteel Co. v. Great Lakes Steel Corp.*, supra; *Bethell v. Porter*, 595 S.W.2d 369 (Mo.App.1980) [8, 9].

■ We turn to plaintiff's appeal of the amount of the judgment entered on the accounting. Plaintiff first contends that the procedure followed in the accounting whereby plaintiff was the first to present evidence was erroneous and requires a remand. Whatever the merits of plaintiff's argument concerning the order of proof, the procedure followed was agreed to by plaintiff at trial.[3] In view of that and our findings on the merits of the accounting we can perceive no prejudicial error.

■ Plaintiff next challenges the method used by the defendant in accounting. That method consisted of allowing plaintiff 4% commission on sales to all customers of Han-Dee Pak not claimed to have been produced by Gubernik. In addition, on all sales to customers conceded to be Gubernik's, defendant allowed Gubernik a commission consisting of the difference between 95% of defendant's "bottom line" figure on each sale, as computed by the accounting expert, and the amount of that sale. This is in accord with the requirements of paragraph (8) of the agreement.[4]

As to disputed customers the defendant, in its accounting, made two different computations, one treating them as Han-Dee Pak customers subject to the 4% commission and the other treating them as Gubernik customers subject to the "bottom line" computation. The trial court, on conflict-

**3.** Counsel on appeal was not trial counsel.

**4.** Some confusion exists in the language of paragraph (8) as to whether the phrase "less freight but including 5% commission of our Bottom Line" modifies "difference" or "price billed to the customer." But the testimony makes clear that it modifies the former and that was the basis on which both parties proceeded. The testimony and the contract, paragraph (7), established that shipments from defendant to customers were F.O.B. Atlanta and that if a different arrangement was desired the freight was to be added to the "bottom line" as an additional

cost of the goods. The testimony and paragraph (7) also made clear that included in the overhead figure used to determine the "bottom line" was a 5% commission which would not be included in arriving at the "bottom line" for Gubernik customers as Han-Dee Pak would not be paying a commission from the bottom line figure. As an example, if the sale price was $100, the bottom line price was $90 and the freight $1; the commission was $100 − $90 − $1 + $4.50 = $13.50. The 95% calculation used by defendant is simply another way to state the same formula.

ing testimony, awarded all disputed customers to Gubernik. That determination is supported by the evidence. The formula used by defendant, and adopted by the trial court, is the same as the formula utilized by plaintiff in his objections to the original accounting filed by defendant. It is a method agreed to as the proper one by both parties at some time in the litigation.

Plaintiff contends, however, that the application of the formula is faulty for two reasons. First, it adjusts the "bottom line" figure for each sale rather than applying the original "bottom line" figure submitted with the July 22 letter, which figure was not updated as provided in paragraph (7) of the July 22 letter. Secondly, because Gubernik did not set the price to the customers the determination of what commissions Gubernik would be entitled to should be based upon an analysis of what price, based on his past history and the market conditions, he would have set if paragraph (6) of the agreement had been adhered to. The contentions are interrelated and some discussion of Gubernik's conduct after the agreement is required.

We agree with plaintiff that the purpose of these provisions was to allow Gubernik an incentive to sell defendant's product. His commission was to be based on the amount above the "bottom line" he could persuade a customer to pay. Updating of the "bottom line" figure served to advise him of the price necessary for him to seek to obtain an adequate commission. However, in his deposition which was introduced into evidence by defendant, Gubernik made it clear that his intention when entering into the contract and thereafter was to remove himself from active participation in the business of manufacturing and selling TowelWets. He considered his function to be the introduction of his customers to Han-Dee Pak, leaving the follow-up generation of sales to that company. This approach to the agreement is summarized by the following question and answer:

"Q. Well, you are involved in the sense that you can participate, as you understood it, in percents of the sales or whatever, but I gather what you are telling me is your understanding of the agreement was you were kind of turning over the whole business to Han-Dee Pak and that after you facilitated an orderly transfer of customers, your active participation in terms of generating sales and generating new customers was nothing?

"A. That was Herb's [Han-Dee Pak President] and my understanding."

It is apparent that Gubernik made no effort to set the prices for goods to customers nor was he interested in receiving updated "bottom line" figures in order to set the prices. He turned the selling function over to Han-Dee Pak and was content to serve as an intermediary between his customers and Han-Dee Pak. In that situation he is in no position to complain if the price set by Han-Dee Pak generated less in commissions than he might have derived had he set the price. Nor do we consider it reasonable to interpret the contract as fixing the "bottom line" at the figure on July 22, 1976. The purpose of the "bottom line" was to return to Han-Dee Pak its cost of manufacturing the product plus a profit. Such a purpose is obviously not served by utilizing in the accounting a "bottom line" figure which did not in fact reflect the actual cost of goods produced plus profit. The failure of defendant to update the "bottom line" figure was in keeping with Gubernik's removal of himself from the selling function because of which his knowledge of the "bottom line" was no longer critical. We find no merit to plaintiff's challenges to the method utilized in the accounting.

■ Our final task in regard to the accounting is to determine whether the judgment rendered by the trial court is supported by the accounting. We find it is not. The trial court entered judgment for the exact amount contained in the account submitted by defendant. As to the Han-Dee Pak customers we find no error in the $16,037.89 for sales to those customers from 1978 until defendant ceased manufacture of TowelWets. As to the disputed customers awarded by the trial court to

Gubernik and conceded Gubernik customers the accounting reflects positive commissions of $22,025.60. It also reflects "negative" commissions of $18,362.62 which were subtracted from the positive commissions to arrive at a "net commission." [5]

The $18,362.62 "negative" commissions contained in the accounting are the yearly totals of commissions based upon adding the "positive" commissions achieved in some months and subtracting the "negative" commissions earned in other months. When the monthly breakdown of commissions is examined the "positive" commissions total $24,511.08. The record does not contain a per sale breakdown of commissions and it is possible that such a breakdown might reflect a larger amount of "positive" commissions than does the monthly breakdown. The documents and the testimony, however, reflect that the "negative" commissions occurred during the later portion of the accounting period when sales to Gubernik customers had declined substantially and defendant was experiencing problems with profitability. We believe on the record before us that any differences between commissions based on the monthly summaries and based upon individual sales would be *de minimis*. Additionally, plaintiff has raised no objection to the failure of the record to reflect the commissions on an individual sale basis nor raised any objection to the accounting on that basis. We, therefore, will determine the correct amount of the accounting on the basis of the monthly breakdown of commissions.

■ We are unable to find any justification under the agreement for "negative" commissions. Gubernik, by his withdrawal from active participation in selling the product, may have left himself vulnerable to sales which would produce no commission but he did not thereby leave himself subject to indebtedness for sales below the "bottom line" price. Nothing in the agreement suggests such an intention and the

law does not mandate such an unconscionable result. A commission is "a fee paid to an agent or employee for transacting a piece of business or performing a service." Webster's Third New International Dictionary, p. 457. The word does not connote a negative fee or a mutual sharing of profits or losses. If Han-Dee Pak elected to sell below the "bottom line" price it was free to do so but it cannot seek to recover its diminution in profit from Gubernik. The reduction of "positive" commissions by the "negative" commissions was erroneous. Judgment for Gubernik on the accounting for commissions should have been $40,548.97.

■ The final matter before us is the plaintiff's contention that the trial court erred in refusing an award of 10% of the original cost of the machines. We agree. The trial court found that under the agreement Gubernik was entitled to payment by defendant of that 10%. The Court, however, found that Gubernik's oral testimony concerning those costs was not the best evidence. That objection was never made by defendant. We must presume that the trial court did not find Gubernik's oral testimony credible for it held that Gubernik had failed to carry his burden of proof on the issue of the amount of those costs. We must respect the court's discretion on credibility but not the result. The record abundantly demonstrates that the machines cost substantial amounts when purchased, that defendant had made substantial periodic payments on those original purchase prices and had made substantial final payments to acquire the machines. Defendant's president testified that it paid at least $50,000 pursuant to paragraph (1) of the agreement for the machines. The plaintiff clearly carried his burden of demonstrating that the machines had an original cost. If the court, on credibility grounds, gave no credence to plaintiff's testimony of the amount of that original cost, then the record supports a finding that the original

---

**5.** The accounting expert testified that these "negative" commissions would arise from sales below the "bottom line" figure but not necessarily from sales at a loss. The sales may have simply been at a profit of less than the 10% built into the "bottom line."

cost was at least $50,000. Plaintiff is entitled to 10% of that or $5000.

Judgment ordering an accounting affirmed. Judgment on the accounting modified to provide judgment in favor of plaintiff for $45,548.97 and as modified is affirmed.

GAERTNER, P.J., and STANLEY A. GRIMM, Special Judge, concur.